Filed 3/1/23  In re A.R. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D080901 |
| Plaintiff and Respondent, | (Super. Ct. No. NJ15847) |
| v. | |
| J.Z., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Affirmed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel for Plaintiff and Respondent.

INTRODUCTION

J.Z. (Mother) appeals a juvenile court order declaring her son, A.R., a dependent of the court pursuant to Welfare and Institutions Code section 300, subdivision (b)(1).[1] Mother contends there is insufficient evidence in the record to support the juvenile court's jurisdictional finding. We conclude, to the contrary, that substantial evidence supports the court's finding and therefore affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

Throughout his childhood, seventeen-year-old A.R. resided in the care of various family members due to instability in Mother's housing. He experienced behavioral issues from a young age; family members described his conduct as aggressive, destructive, and unpredictable. Mother reported that A.R. chased his older siblings with knives and that he was expelled from elementary school for threatening another student with a knife.

A.R.'s mental health issues also concerned the family. Mother reported instances where he talked to himself and watched family members in their sleep. She also recalled an incident in which he repeatedly punched a family member's dog. A.R.'s grandmother described an episode in which he started crying, screaming, and pulling his own hair. Because of his unpredictable behavior, A.R.'s grandmother was afraid of him, and he was not permitted to live with her.

Compounding his behavioral and mental health issues, A.R. also struggled with substance abuse. He disclosed that he first smoked marijuana in the fourth grade and tried methamphetamine at 15 years old. He then began using methamphetamine daily, ingesting as much as one gram per

---

[1]    All undesignated statutory references are to the Welfare and Institutions Code.

day. Mother sent A.R. to a residential drug treatment program, but he was discharged 20 days later when he punched a hole in the wall and had a physical altercation with another patient.

In May 2022, A.R. and Mother got into an argument during which A.R. banged on the walls of their apartment, threw items, and called Mother names. The police were called and Mother lost her housing due to this incident. Believing he was experiencing a mental health crisis, Mother drove A.R. to a psychiatric hospital. On the way to the hospital, he attempted to jump from the moving vehicle. Once they arrived, he was admitted for suicidal ideation.

A.R. was then discharged from the hospital and released to the San Diego Youth Services emergency transitional shelter ("Storefront"). Although Storefront typically allows youth to reside on their premises for up to 21 days, A.R. was discharged within six days because he had a physical altercation with another youth at the shelter. After he was discharged, the staff allowed A.R. to stay at the shelter for an additional day when their attempts to contact Mother were unsuccessful.

Unable to get in touch with Mother, Storefront contacted law enforcement to retrieve A.R. Police declined Storefront's request because Mother reported she would pick up A.R. that afternoon. But she then called Storefront and told the staff, " 'I don't want him, and I can't have him in my house.' " When the staff informed her that the Agency would become involved if she refused to pick up A.R., Mother responded, " 'I don't care, just file whatever you need to, I don't want him.' "

A.R. was then taken into protective custody and transported to Polinsky Children's Center (PCC). A social worker contacted Mother and described the court process to her. Mother stated that she did not feel she

was able to ensure A.R.'s safety in her home and confirmed that neither she, nor any family members, were able to care for him.

On June 15, 2022, the Agency filed a juvenile dependency petition. The petition alleged that A.R. fell within the jurisdiction of the juvenile court pursuant to section 300, subdivision (b)(1), because Mother was unwilling to provide for him after he was brought into custody. Specifically, the petition asserted that "[t]he child has suffered or there is a substantial risk that the child will suffer, serious physical harm or illness by the willful or negligent failure of the parent or legal guardian to provide the child with adequate food, clothing, shelter, or medical treatment."

The juvenile court conducted a detention hearing the next day and made prima facie findings on the petition. The court detained A.R. in out-of-home care at PCC, an approved foster home, or a short-term residential therapeutic program. It allowed for liberal supervised parental visitation and set the matter for a jurisdiction and disposition hearing.

A few weeks later, A.R. left PCC without permission and admitted to smoking marijuana during his absence. A female staff member reported that A.R. intentionally groped her.

A.R. was transferred to the Center for Positive Changes, Kenora ("Kenora"), a therapeutic treatment center. While residing at Kenora, he was suspended from school for getting into a fight with another student. Despite this fight and the suspension, the staff at Kenora informed the Agency that A.R. was doing well and making progress. While there were times when he needed redirection, he reportedly responded in an appropriate manner when prompted to change his behavior. Mother opined that A.R. was doing well at Kenora and appeared happy and healthy.

4

A.R. and Mother had both in-person and telephonic visits. Neither reported any issues related to the visitation and they both felt the visits were positive. On one occasion, the social worker observed A.R. hug Mother and tell her that he loved her. A.R. expressed willingness to transitioning to unsupervised visitation with Mother.

In August 2022, there was a child and family team meeting attended by A.R., Mother, A.R.'s social worker, and members of A.R.'s treatment team from Kenora. The meeting included a " 'Qualified Individual' assessment" that A.R. was not sufficiently stable to be treated outside of a highly structured, 24-hour therapeutic environment. Consequently, the team did not believe a lower level of care was appropriate to meet A.R.'s needs. The Agency recommended that A.R. be declared a dependent of the juvenile court and that reunification services be offered to Mother.

On September 6, 2022, the juvenile court conducted the contested jurisdiction and disposition hearing. During opening statement, Mother's counsel proffered that they would be asking the court to find the allegation under section 300, subdivision (b), was not proven. The social worker, Mother, and A.R. testified.[2]

According to the social worker, Mother said she did not want A.R. to come home after he was discharged from Storefront. Mother did not feel qualified to treat A.R.'s mental health needs and indicated she could not

_____

[2] Without objection, the court received into evidence the detention report dated June 16, 2022; jurisdiction and disposition report dated July 7, 2022; and three addendum reports dated July 21, 2022, August 29, 2022 and September 6, 2022. The Agency asked the court not to consider A.R.'s psychological evaluation as part of its jurisdictional analysis. We have reviewed these reports, aside from the psychological evaluation, in deciding this appeal.

afford to pay for his residential treatment. The social worker then described acts of aggression by A.R., the most recent of which happened within two weeks of the jurisdictional hearing. She concluded that A.R. was in need of the high level of care he was receiving at Kenora and that he was not yet ready to live at home with Mother.

A.R. testified that although Mother once tried to place him in a drug rehab program, she made no other attempts to provide him with any counseling. He expressed a willingness to continue receiving therapy and counseling, and a desire to change his "attitude" and the way he handles situations. A.R. told the court that he would like to "go back home to [his] mother."

Mother explained that when A.R. was discharged from Storefront, she was uncomfortable accepting him back into her care because his behavior had resulted in the loss of their housing. She stated that she had sought alternative housing for A.R. with her mother and various friends, but they refused. PCC informed Mother they could not accept A.R. unless there was an open dependency case or "CPS" involvement.

Mother said she was informed a dependency case would be initiated if she failed to pick up A.R. She testified that she understood her actions would be viewed as abandonment, but she believed her refusal was the only way to get A.R. the services he needed. Mother claimed she provided A.R. with clothing, money, and emotional support after he was detained. At the same time, however, she acknowledged that she had not provided A.R. with housing, food, or insurance since July 2022. Mother testified that, as of the jurisdiction and disposition hearing, she did not have secure housing and A.R. was not permitted to reside in her current temporary home.

6

During closing argument, Mother's counsel asked the court to amend the petition to conform to proof of jurisdiction under subdivision (c) of section 300 rather than subdivision (b). Mother then argued that the allegations under subdivision (b) had not been proven. She asserted that A.R. had not suffered, and was not at substantial risk of suffering, serious physical harm. She contended that her actions throughout the case were aimed at getting A.R. the services he needed, not shirking her parental duties.

The juvenile court denied Mother's request to amend the petition because there were insufficient grounds to "add a whole new count with an entirely different and distinct legal theory." The court then noted the difficult position in which Mother was placed and allocated "equal responsibility to the system in not being able to mobilize enough services that would really successfully intervene with this family." Even so, it observed that it is the parent's primary responsibility to provide for the care of their child. The court found that regardless of fault, there was an interruption in "Mother's choice to continue to provide care and control" of A.R. Accordingly, it determined that A.R. was a person described in section 300, subdivision (b), and made a true finding on the petition.

## DISCUSSION

Mother contends the record contains insufficient evidence that A.R. was harmed, or at substantial risk of being harmed, and so the jurisdictional order should be reversed. The Agency responds that Mother submitted to the juvenile court's jurisdiction and therefore she forfeited the issue on appeal. It further asserts that substantial evidence supports the juvenile court's finding of jurisdiction because the record demonstrated Mother failed to provide A.R. with the necessities of life. We conclude that Mother did not forfeit her claim

7

on appeal, but nonetheless affirm the jurisdictional order because it was supported by substantial evidence.

A.    *Mother Did Not Forfeit Her Claim on Appeal*

When parents request a contested jurisdictional hearing, they preserve their right to challenge the sufficiency of the evidence supporting the juvenile court's jurisdictional orders. (See *In re Isabella F.* (2014) 226 Cal.App.4th 128, 136 ["mother preserved her right to challenge the sufficiency of the evidence supporting the juvenile court's orders by requesting a contested jurisdictional/dispositional hearing after the parties were unable to reach a negotiated resolution"].) " 'Sufficiency of the evidence has always been viewed as a question necessarily and inherently raised in every contested trial of any issue of fact, and requiring no further steps by the aggrieved party to be preserved for appeal.' " (*Ibid.*) To require the parent to take additional steps to preserve their right to appeal "would improperly weaken the [Agency's] burden of establishing jurisdiction by a preponderance of the evidence." (*Ibid.*)

Here, Mother preserved her right to challenge the sufficiency of the evidence supporting the jurisdictional order by not only requesting a contested hearing, but also presenting evidence and arguing against jurisdiction at the hearing. While her counsel did suggest that jurisdiction would be appropriate under section 300, subdivision (c), the petition included no allegation under this subdivision. Counsel's statement that other grounds for jurisdiction may have been proven by the evidence—grounds the juvenile court ultimately refused to consider—does not signal that Mother acquiesced to the court's jurisdiction as alleged. (See *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 [a reviewing court may affirm a finding of jurisdiction

8

when substantial evidence supports *any* allegation within the petition, and there are *multiple grounds* for jurisdiction alleged].)

If Mother had admitted to the sole allegation within the petition and submitted to the court's jurisdiction, the court would have been required to find that she understood the consequences of her admission and that her admission was voluntarily made. (Cal. Rules of Court, rule 5.682(e).) But Mother made no such admission, and the juvenile court made no such inquiry. Rather, she rigorously contested the sole basis for jurisdiction through counsel's cross-examination and argument, and through Mother's own testimony. Thus, she did not forfeit her claim that the court's ultimate jurisdictional finding was unsupported by substantial evidence.

B. *Substantial Evidence Supports the Jurisdictional Finding*

Mother asserts that the juvenile court's jurisdictional finding is not supported by substantial evidence.[3] In reviewing such findings, " 'we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court;

_____

[3] Mother also lists alternative resources that she contends could have been provided to A.R. in lieu of filing a dependency petition, including a referral to probate court or a county mental health program. She does not, however, cite to any authority that suggests the juvenile court's finding of jurisdiction was affected by a failure to refer him to these programs. Nor does she contend the court had sua sponte duty to make such a referral. The issue before this court is whether substantial evidence supports the juvenile court's finding, not whether alternative programs were available. And, notably, Mother did not ask for such a referral during the jurisdiction and disposition hearing and therefore forfeited the issue on appeal. (See *In re Dakota H.* (2005) 132 Cal.App.4th 212, 221 ["A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court."].)

we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633 (*R.T.*).)

Here, the juvenile court asserted jurisdiction over A.R. pursuant to section 300, subdivision (b)(1). This subdivision provides for jurisdiction where a preponderance of the evidence shows "(1) one or more of the statutorily-specified omissions in providing care for the child . . . (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.) The specific omission at issue in this case under subdivision (b)(1)(C) involved the allegedly "willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment."[4]

Both parties cite to *R.T., supra,* in which the Supreme Court held that the first clause of section 300, subdivision (b)(1), does not require a finding that "a parent is at fault or blameworthy for [their] failure or inability to supervise or protect [their] child." (*R.T., supra,* 3 Cal.5th at p. 624.) In this case, however, the allegation falls under the "third clause" of that statute. (See *id.* at p. 625 [noting that the dependency petition at issue in *R.T.* included an allegation under "§ 300(b)(1), first clause"].) *R.T.* distinguished between the first clause, which "requires no more than the parent's *'failure or inability* . . . to adequately supervise or protect the child'" (*id.* at p. 629,

---

4 While the dependency petition did not expressly cite to section 300, subdivision (b)(1)(C) as the basis for jurisdiction, the language of the allegation mirrored that subdivision in stating that "the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness by the willful or negligent failure of the parent or legal guardian to provide the child with adequate food, clothing, shelter, or medical treatment."

italics added), and the third clause, which requires the parent's " '*willful or negligent failure . . .* to provide the child with adequate food, clothing, shelter, or medical treatment.' " (*Id*. at p. 630, italics added.) Thus, the holding from *R.T.* does not apply. At the same time, the court's conceptual comments can offer us helpful guidance: " 'The loss of parental control is rarely if ever attributable solely to the parent or the child. It is instead the result of a long and complicated chain of actions and reactions culminating in the child's refusal to submit to parental authority. To attempt to affix responsibility on one party or the other is alien not only to the spirit and letter of the juvenile court laws, but to any realistic view of family relationships.' " (*Id*. at p. 635.)

Similarly, we need not find—and do not find—that Mother was morally culpable or blameworthy for the circumstances that led to the filing of the dependency petition in this case. Rather, our task is simply to determine whether substantial evidence supports the juvenile court's finding that Mother willfully or negligently failed to provide A.R. with food, clothing, shelter, or medical treatment in such a way that exposed him to a substantial risk of harm. (See § 300, subd. (b)(1)(C).) As the juvenile court remarked, there is no doubt that Mother loved A.R. and attempted to meet his needs to the best of her ability. But the evidence also demonstrated that whatever her motive, Mother willfully refused to pick up A.R. when he was discharged from his transitional housing. The result of Mother's willful refusal to reassume care for A.R. was that she did not provide for his necessities, including food

11

and shelter, nor did she make arrangements for his care other than relying on the Agency's intervention and his placement at PCC.[5]

The causes that led to A.R.'s detention and placement at a therapeutic facility are undoubtedly varied and complex. Mother struggled to manage A.R.'s behavioral, mental health, and substance abuse issues that he experienced throughout his life. And these behavioral issues were likely compounded by the instability he experienced moving between family members during his childhood. Regardless, Mother testified that she did not believe she was able to ensure A.R.'s safety if he was left in her care, and as of the jurisdiction and disposition hearing, she did not have a plan for her own housing or a plan to reassume A.R.'s care. While Mother's obstacles in obtaining housing may not serve as a basis to find that she failed to provide for A.R., the record does not reflect that she developed a suitable plan to arrange for A.R.'s housing or care, particularly in light of his special needs. (See *In re S.S.* (2020) 55 Cal.App.5th 355, 373 [" 'poverty alone, even abject poverty resulting in homelessness, is not a valid basis for assertion of juvenile court jurisdiction' "].)

Contrary to the argument advanced by Mother, the evidence does not show she was unable to care for A.R. simply because the residential programs she sought refused to accept him. Rather, the record established she failed to provide for A.R.'s necessities in a way that ensured he was not at a

---

[5]    Our sister court in *In re Andrew S.* (2016) 2 Cal.App.5th 536, 542, held that the juvenile court may not find jurisdiction over an "otherwise well-cared-for child simply because an absent parent has not provided support." But this case is distinguishable from *Andrew S.* because here, A.R. was not provided for by another caregiver, familiar or otherwise, and the evidence established that Mother was unable to make arrangements for such care. A.R.'s needs were met solely because of Agency intervention and the resources it provided.

12

substantial risk of harm. The evidence demonstrated that his behavioral issues, which included acts of violence towards others and an attempt to jump from a moving vehicle, could not be addressed outside of a highly structured environment. The social worker testified that A.R. needed the high level of care he was receiving at Kenora, and that he was not yet ready to reside with Mother. Mother herself stated she did not feel she was able to safely provide for A.R., nor did she have family members or other caretakers who were able to provide for his care.

Accordingly, considered in its totality, the evidence is sufficient to support the juvenile court's finding that A.R. was at substantial risk of harm because of Mother's willful failure to provide for his care. We therefore conclude substantial evidence supports the juvenile court's jurisdictional finding and we affirm the order.

## DISPOSITION

The jurisdictional order is affirmed.

DATO, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

13